592 A.2d 1126

**Francesco B. DiLEO**

v.

**Catherine D. NUGENT.**

**No. 644, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

July 29, 1991.

Certiorari Granted Dec. 12, 1991.

60

62

64

Michael P. Smith, Baltimore (Herbert Better, Zuckerman, Spaeder, Goldstein, Taylor & Better, Baltimore, William W. Taylor, III, Michael R. Smith, Leslie M. Berger and Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., on the brief), for appellant.

LaVonna Vice (Marvin Ellin and Ellin & Baker, on the brief), Baltimore, for appellee.

Argued before BISHOP, GARRITY, and GEORGE W. BOWLING (Specially Assigned), JJ.

BOWLING, Judge.

This appeal stems from a medical malpractice action brought by appellee, Catherine D. Nugent. Appellee claimed to have suffered post traumatic stress disorder as a result of improper drug treatment and sexual contact with her psychiatrist, appellant, Francisco B. DiLeo. A Health Claims Arbitration (HCA) panel determined appellant was negligent and awarded compensatory and punitive damages. Appellee rejected the award and prayed a jury trial in the Circuit Court for Baltimore City (Heller, J., presiding). The jury found appellant liable for negligence and intentional misrepresentation. They awarded appellee $50,-000 for past and $150,000 for future medical expenses and $500,000 for non-economic damages. The trial court denied appellant's motions for judgment notwithstanding the verdict, a new trial and remittitur.

We shall affirm.

## BACKGROUND

Appellee, Catherine D. Nugent, is a certified clinical practitioner of group psychotherapy and group psychodrama. She holds a Bachelor of Arts degree in mental health counseling and a Master of Science degree in applied behavioral science.

Appellant is a psychiatrist who maintains a private practice of psychoanalytically oriented therapy. He has conducted research approved by the U.S. Food and Drug Administration and has published works concerning the use of psychedelic drugs in therapy.

Appellee began treatment with appellant on December 21, 1981, and participated in private therapy sessions twice a week until mid–1986. Appellee testified that the therapy became the priority in her life, that she never cancelled a session, and that appellant's approval was crucial to her. Psychiatrists, testifying as expert witnesses for appellee,

explained that "transference" [1] occurred in the patient-therapist relationship.

In the summer of 1985, appellee's therapy had reached what clinically is termed "a therapeutic impasse". According to expert testimony, when this occurs, the patient becomes "bogged down and tongued-tied" and is unable to verbalize feelings she has for her therapist. Appellee asked appellant if MDMA would be beneficial to her. MDMA, or "ecstasy", is an illicit psychedelic drug. He suggested they consider the use of the drug in the future. Appellee told appellant that she had access to the drug, and he indicated it was preferable that she obtain the drug herself.

According to appellee's testimony, appellant indicated in December, 1985, that the time was right for an "all day experimental session" using MDMA. On February 21, 1986, after arriving at appellant's home at 9:00 a.m., appellee ingested the MDMA pill she had received from her own sources. As the drug took effect, she described feeling disoriented, light-headed, confused and upset. Appellee and appellant lay on a mat together, and appellant began caressing and fondling appellee. At one point, she requested appellant to touch her sexually. She testified that later he gave her tryptamine, commonly referred to as "white smoke", to inhale because the drug she had taken needed a booster.

Later in the afternoon, when appellee expressed her agitation and distress about her sexual contact with appellant, he explained that he had been trying to "modify a negative introject" of hers and that what he had done was a "way of partial fulfillment of [her] oedipal wishes". At trial, one of appellee's experts countered appellant's ration-

1. As described at trial, transference is a phenomenon in psychotherapy in which a patient develops strong feelings about her therapist which stem from early childhood. In essence, an adult experiencing transference reacts to other adults in the way she reacted to her parents as a child. In a treatment situation, the patient begins to fantasize a relationship with the therapist in which the therapist is all powerful, loving, caring, and god-like.

alization for his treatment technique when the expert testified that to do anything of a physical nature with a patient is totally unacceptable, counter-therapeutic, and forbidden by the American Psychiatric Association.

Appellee testified that she suffered a panic attack shortly after the drug session and contacted appellant. She testified that he advised her to write down her experiences. She began writing a journal. Over the next few months, appellee composed an 800 page journal. At one point, she made a photocopy and gave it to appellant. She testified that later she repossessed it and destroyed both the copy and her original.

Following the drug session of February 21, 1986, appellee began having difficulty functioning in her normal daily routine at home and at work. She testified that she considered suicide. Witnesses testified that she became withdrawn and anxious.

She continued in her regular therapy session with appellant. Our review of appellee's testimony reveals that appellant's conduct during these sessions was, to say the least, questionable. Appellee testified that she and appellant lay on the floor together during therapy sessions and that he sometimes touched her sexually. On one occasion, when appellee arrived for her session, there was a pornographic movie showing on appellant's television and he appeared "bleary eyed" and was "walking funny".

Appellee testified that appellant scheduled a second drug session with her for July 1, 1986. Appellee's therapist at the time of trial, Dr. Lois Love, testified that Sansert[2] was administered at that session. Appellee testified that she reacted negatively to this drug which caused shaking, crying, confusion and fear.

---

2. We could not discern any information about Sansert from the record extract. According to the 1990 *Physicians' Desk Reference,* 44th Edition, Sansert is used in the treatment of vascular headaches. A possible adverse reaction to Sansert is hallucinatory experiences.

On October 14, 1986, she went to appellant's home for her scheduled session. During that session, appellee testified that she and appellant engaged in sexual intercourse. Distraught over the events of that session, and her relationship with appellant in general, appellee terminated all contact with the appellant.

Appellee testified that her life has changed as a result of the care she received from appellant. She has terminated her practice as a psychodramatist. Appellee's experts testified that it is unlikely she will be able to resume her career as a mental health therapist. Her physicians have diagnosed her as suffering from post-traumatic stress disorder [3] and anxiety neuroses. They recommended regular and continuing therapy, which she was undergoing at the time of trial.

Appellant did not testify on his behalf at trial; nor did appellee call him during her case-in-chief. Appellant relied instead on testimony he had given in deposition and before the HCA panel.

The jury found appellant liable for negligence and for willful and deliberate misrepresentation. They found that appellee was not contributorially negligent. This appeal followed.

## DISCUSSION

### I.

Appellant contends that the trial court committed four errors relating to jury instructions. As we review appellant's argument, we rely on Maryland Rule 2–520(c) which states:

---

**3.** An expert at trial described post traumatic stress disorder. It is an official diagnosis of the American Psychiatric Association that "applies to people who have been subjected to unusual stresses and strains" relating to a catastrophic event. Symptoms can include nightmares, thinking about the event constantly, or conversely, avoiding recalling the event; hyper-reactivity or a quick startle response; and a feeling of emotional numbness.

The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

### A.

First, appellant contends that the trial court erred in giving the "missing witness" [4] instruction as a consequence of appellant's decision not to testify at trial. We find no merit to this contention.

■ Contrary to appellant's assertion, his testimony would not have been cumulative. Cumulative evidence is a waste of time because it merely repeats previously undisputed testimony. McLain, *Maryland Practice*, Sec. 403.1 (1987); *Drug Fair v. Smith*, 263 Md. 341, 355, 283 A.2d 392 (1971). Appellant's version of his treatment of appellee, even though it may have been repetitive of appellee's testimony, would have provided the jury with evidence against which to gauge appellee's testimony.

■ When a party in a civil case refuses to take the stand to testify as to facts peculiarly within his knowledge, the the trial court or jury may infer that the testimony not produced would have been unfavorable. The unfavorable inference applies, however, only where it would be natural under the circumstances for a party to speak, call witnesses or present evidence. *Brooks v. Daley*, 242 Md. 185, 194, 218 A.2d 184 (1965).

■ The events which transpired at the psychotherapy sessions are clearly within appellant's peculiar knowledge.

---

**4.** The trial judge gave the following jury instruction:
Members of the jury, you are instructed that because the Defendant, Dr. DiLeo, failed to testify about facts peculiarly within his knowledge, you may, but are not required, to infer that his testimony would have been unfavorable to his case.

He was in the unique position of being the only other person with any first-hand knowledge of the therapy sessions. In light of the accusations made and the aspersions cast by appellee, we believe it would have been natural for the appellant to offer his account of the therapy sessions.

■ Appellant declares that the "missing witness" instruction was incorrect because appellee had the opportunity to call appellant as her witness. Appellant's argument is misplaced. This court has said that a missing witness instruction is improper when a witness is equally available to both sides. *Hayes v. State*, 57 Md.App. 489, 494–495, 470 A.2d 1301 (1984), *quoting Graves v. U.S.*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed 1021 (1893). This corollary to the general rule, however, has been applied in cases in which the uncalled witness is not a party. *Jacobson v. Julian*, 246 Md. 549, 229 A.2d 108 (1966); *Yuen v. State*, 43 Md.App. 109, 403 A.2d 819 (1979), *cert. denied*, 286 Md. 756 (1980). Here, appellee had no duty to elicit testimony from appellant who, by definition, was an adverse witness and a party. The use of the "missing witness" instruction was not in error.

## B.

Second, appellant contends that the trial judge's instruction concerning destruction of evidence was incorrect. We disagree.

■ Appellee testified that she destroyed the journal which she kept during the final nine months of her relationship with appellant and gave reasons for her actions.[5] The trial judge instructed the jury that the destruction of evidence by a party gives rise to an inference or presumption that would be unfavorable to the person who destroyed or

---

5. Appellee admitted that she destroyed the journal after consultation with an attorney. She testified she did so, however, because she feared that she would commit suicide and that her family would be upset by the journal. She also feared reading it would return her to "that crazy state again".

altered the evidence. The trial judge further explained that the nature of the inference which could be drawn from this evidence depended upon appellee's motivation. The trial judge left the possible determinations open to the jury. She commented that unexplained destruction could lead the jury to infer that the evidence would have been unfavorable to the appellee. Conversely, the trial judge instructed the jury that they could, but were not required to accept appellee's reasons for destroying the journal.

■ We believe that the trial judge's jury instruction was correctly aligned with the law set forth in *Miller v. Montgomery County*, 64 Md.App. 202, 494 A.2d 761, *cert. denied*, 304 Md. 299, 498 A.2d 1185 (1985). In that case, we said that the destruction of evidence by a party gives rise to inferences or presumptions which are unfavorable to the spoliator. The inference depends, however, upon the intent or motive of the party who is responsible for the destruction. Unexplained and intentional destruction of evidence by a litigant gives rise to an inference that the evidence would have been unfavorable, but would not in itself amount to substantive proof that the evidence was unfavorable. *Miller*, 64 Md.App. at 214, 494 A.2d 761.

■ Appellant is correct that the trial judge did not elaborate on the portion of *Miller* in which we said that if a jury finds a party has altered or destroyed evidence with fraudulent intent, it may presume the party's case is weak and the party's belief that it would not prevail without the aid of such improper tactics. *Miller*, 64 Md.App. at 215, 494 A.2d 761. A litigant is entitled to have his or her theory of the case presented to the jury if that theory is a correct exposition of the law and if there is evidence in the case that supports the theory. *Myers v. Alessi*, 80 Md.App. 124, 131, 560 A.2d 59, *cert. denied*, 317 Md. 640, 566 A.2d 101 (1989). We do not believe the evidence in this case was sufficient to offer the question of fraudulent concealment to the jury. There is a distinction between the failure to produce specific evidence and fraudulent conduct aimed at

suppressing or spoliating evidence. *Meyer v. McDonnel,* 40 Md.App. 524, 530, 392 A.2d 1129 (1978). Appellee provided explanations for her failure to produce her journal. The trial judge gave the jury the opportunity to evaluate the credibility of her explanations and draw inferences accordingly. The instruction given fairly covered the matter pursuant to Maryland Rule 2–520(c). There was no error.

## C.

Appellant next complains that the jury instructions concerning possible contributory negligence on the part of appellee were incorrect. Specifically, appellant contends that the trial court erred in failing to instruct the jury that appellee could be found contributorially negligent even if she did not foresee the specific harm she suffered as long as she was aware she was exposing herself to some harm. Again, we believe the trial court followed the dictates of Maryland Rule 2–520(c).

We had the occasion to address the issue of contributory negligence in a medical malpractice setting in *Myers v. Alessi,* 80 Md.App. at 132–133, 560 A.2d 59. There we said:

In order for a plaintiff to be found contributorially negligent, his or her conduct must either be such (1) that he or she intentionally and unreasonably exposes himself or herself to danger created by the defendant's negligence, of which danger the plaintiff knows or has reason to know, or (2) that his or her conduct falls short of the standard to which the reasonable [person] should conform in order to protect himself from harm.

■ In the case before us, the jury instructions given by the trial court adhered to and, in fact, surpassed the requirements set forth in *Myers.* The trial court instructed the jury that they could find contributory negligence if they made one of three determinations: (1) if appellee was aware or should have been aware of the risks in the treatment, or (2) if she intentionally and unreasonably exposed herself to a danger created by appellant's negligence of which she

knew or had reasons to know, or (3) if appellee failed to exercise ordinary and reasonable care for her own safety by doing or failing to do something a person of reasonable prudence would have done under the circumstances.

■ There is no requirement that a jury be instructed that even if a plaintiff did not foresee specific harm, he or she still may be contributorially negligent. The general instruction, given in this case, was sufficient to address the issue in conformance with Rule 2–520. There was no error.

### D.

■ The final aspect of appellant's discontent with the trial court's instructions concerns the question of whether a patient is contributorially negligent if she follows her physician's orders. Specifically, appellant contends that the trial court erred when it instructed the jury that:

"it is not contributory negligence for a patient to follow a doctor's instructions or rely on his advice when that patient has no reason to suspect the doctor's treatment or advice is the cause of the patient's injury".

Appellant suggests that because appellee harbored suspicions about the efficacy of her treatment, she should be removed from the class of patients who are entitled to rely on and follow their physician's orders. This suggestion is specious.

■ The instruction given conforms precisely with Maryland law. We have recognized in the past that a patient is not in a position to diagnose her own ailments, appreciate the risks of medication or evaluate whether the prescribed course of treatment is in her best interest. As a consequence, it is not contributory negligence for a patient to follow a doctor's instructions or rely on the doctor's advice, to fail to consult another doctor when the patient has no reason to believe that the doctor's negligence has caused her injury, or to fail to diagnose her own illness. *Santoni v. Moodie,* 53 Md.App. 129, 138, 452 A.2d 1223 (1982). The trial court did not err in delivering this jury instruction.

## II.

Appellant next contends that the allegation of fraudulent or intentional misrepresentation was not submitted to the HCA panel and therefore was not properly before the circuit court jury. We disagree.

The Health Care Malpractice Claims Act requires that all claims against a health care provider for medical injury in which damages of more than the limit of the concurrent jurisdiction of the District Court are sought must be submitted to mandatory arbitration prior to the institution of court action. Maryland Cts. & Jud.Proc.Code Ann.Sec. 3–2A–02(a). *Reilly v. Newman,* 74 Md.App. 281, 289, 536 A.2d 1230 (1988), *cert. granted,* 312 Md. 661, 541 A.2d 995, *modified on other grounds,* 314 Md. 364, 550 A.2d 959 (1989). Appellee prefaced both counts of her complaints filed at the HCA office and the circuit court with "Comes now the Plaintiff, Catherine D. Nugent ... and in support of her claim for negligence, alleges ...". Substantive reading of the body of Count II, however, reveals the explicit allegation that appellant "willfully and deliberately misrepresented" the treatment he provided.

A "claim" is a group or aggregate of operative facts giving ground or occasion for judicial action. It is distinguishable from the more narrow concept of a cause of action. *Group Health Association v. Blumenthal,* 295 Md. 104, 112, 453 A.2d 1198 (1983). The operative facts in appellee's case against appellant are relevant to both her claims of negligence and misrepresentation. It is not the label or caption given to a claim which determines whether it is properly before the arbitration panel; it is whether the merits of the claim are based on the rendering or failure to render health care. *See Roberts v. Suburban Hospital,* 73 Md.App. 1, 5–6, 532 A.2d 1081 (1987). The claim was before and decided by the HCA panel and the trial court correctly presented the issue to the jury.

### III.

Additionally, appellant maintains that there was insufficient evidence to present the question of fraudulent misrepresentation to the jury and insufficient evidence to sustain the jury's verdict finding fraudulent misrepresentation. We disagree.

To prevail in the case *sub judice,* appellee had the burden to show that (1) a false representation was made; (2) the falsity was known to the speaker; (3) the misrepresentation was made for the purpose of defrauding the plaintiff; (4) the plaintiff relied on the misrepresentation, had a right to rely on it, and would not have done the thing from which the injury resulted if the misrepresentation had not been made; and (5) the plaintiff suffered a loss or injury by reason of the misrepresentation. *Smith v. Rosenthal Toyota, Inc.,* 83 Md.App. 55, 60, 573 A.2d 418 (1990).

The general rule by which the sufficiency of the evidence is tested on appellate review is the same for a judgment n.o.v. and a directed verdict. The evidence and the reasonable inferences to be drawn from it are to be considered in the light most favorable to the party opposing the motion. *Impala Platinum v. Impala Sales,* 283 Md. 296, 327, 389 A.2d 887 (1978). If there is any competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted to the jury. *Montgomery Ward & Company v. McFarland,* 21 Md.App. 501, 513, 319 A.2d 824 (1974). If the evidence and all inferences fairly deducible therefrom are sufficient to lead to conclusions from which reasonable minds could differ, the issue is one for the jury. *Impala,* 283 Md. at 327, 389 A.2d 887.

We agree with the trial court's decision that there was sufficient evidence from which the jury could find intentional misrepresentation by appellant. Appellee testified about the information appellant provided concerning the treatment she was undergoing. Experts testified that appellant should have known his therapy techniques would

not be beneficial. Both appellee and her experts explained the transference phenomenon which rendered appellee vulnerable to appellant. Appellee admitted that she followed appellant's directions. The nature of the relationship between appellee and appellant that was demonstrated to the jury, could lead the jury to believe that appellee was justified in following appellant's instructions. Finally, appellee and her experts testified that appellee has been injured as a result of the treatment by appellant.

The question of whether appellant intentionally or fraudulently misrepresented the treatment he was performing was a question of fact. In making a determination or finding of fact, a jury assesses and evaluates the weight to be assigned to the evidence presented to it and decides its effect. Neither the trial court nor this Court is permitted to substitute its evaluation of the evidence for that of the jury. To do so would be an invasion of the jury's province. *Thodos v. Bland,* 75 Md.App. 700, 714, 542 A.2d 1307 (1988).

### IV.

Next, appellant asserts that there is insufficient evidence to support the damages awarded by the jury for future medical expenses. The jury awarded Ms. Nugent $150,000.00 for future medical expenses. Future damages need to be reasonably probable. *Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975). The award may not be based on speculative, remote or uncertain damages. *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 666, 464 A.2d 1020, 1026 (1983).

Several of appellee's medical experts testified that she sustained post-traumatic stress disorder. An expert witness in psychiatry for appellant, Dr. Spodak, stated his opinion as to the recovery time for a person with post-traumatic stress disorder:

The whole thing generally takes about 6 months. Sometimes it takes a year. But it is extremely unusual to have

a condition go on beyond a year unless some other factor comes along which kind of complicates the picture.

Dr. Gutheil also testified for the appellant as to the recovery time needed for post-traumatic stress disorder: "The average recovery is about 6 months but again, obviously it varies with the trauma and the individual". Furthermore, Dr. Murphy, appellee's medical expert, testified that appellee would require long-term treatment. The experts' testimony was sufficient for the jury to award future damages with reasonable probability. If the jury believed the diagnosis by appellee's experts that she had post-traumatic stress disorder, future damages were certain and it was a jury question as to what amount to award for future damages.

The jury could determine future damages with reasonable probability and, therefore, the trial court correctly presented the issue to the jury.

### V.

Lastly, we address appellant's contention that the award of $500,000.00 for "pain, the mental pain and suffering or anguish" surpasses the tort recovery cap of $350,-000.00 for non-economic damages set by the legislature. Md.Cts. & Jud.Proc.Code Ann. Sec. 11–108. This limitation applies to all cases in which the cause of action arose on or after July 1, 1986. In *Hill v. Fitzgerald,* 304 Md. 689, 501 A.2d 27 (1985), the Court of Appeals expounded on the process used to determine when a medical malpractice cause of action arises. The Court held that a medical injury occurs when a negligent act, coupled with the resulting harm, amounts to a legally cognizable wrong. *Id.* at 696, 501 A.2d 27. The first drug session instituted by appellant occurred on February 21, 1986. The harm appellee suffered as a direct result of ingesting the drug was therefore actionable prior to the cut-off date of July 1, 1986. Appel-

**78**

lee's cause of action is not subject to the limitations of Section 11–108.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.