670 A.2d 466

Gerardo ARAIZA et al.

v.

Heather Jean ROSKOWINSKI–DRONEBURG.

No. 49, Sept. Term, 1995.

Court of Appeals of Maryland.

Jan. 24, 1996.

Conrad W. Varner (Frederick W. Goundry, III, Miles & Stockbridge, P.C., on brief), Frederick, for Appellants.

Jeffrey A. Shane (James P. Sullivan, Ashley Joel Gardner, Elizabeth N. Shomaker, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., on brief), Rockville, for Appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

In *Osztreicher v. Juanteguy*, 338 Md. 528, 659 A.2d 1278 (1995), we granted certiorari to consider whether medical expert witnesses may be required to produce their tax and financial records to the opposing party for possible use in impeachment. *Id.* at 530, 659 A.2d at 1279. There we were unable to reach the issue because the party who opposed production had acquiesced in the adverse judgment sought to be appealed. *Id.* In the instant matter we issued certiorari on our own motion, and prior to consideration of the case by the Court of Special Appeals, in order to address substantially the same question. Again, we do not reach that issue. Here, the trial court ruling complained of is grounded on a conventional exercise of discretion in quashing a trial subpoena.

The instant case is a medical malpractice action that originated in Health Claims Arbitration (H.C.A.). See Md.Code (1974, 1995 Repl.Vol., 1995 Cum.Supp.), §§ 3-2A-01 through 3-2A-09 of the Courts and Judicial Proceedings Article. Prior to the H.C.A. hearing the parties agreed to waive further proceedings in arbitration, and a complaint was filed in the Circuit Court for Frederick County. The plaintiff was Heather Jean Roskowinski-Droneburg (Plaintiff), and the defendants were Gerardo Araiza, M.D., Gerrit J. Schipper, M.D., and their professional corporation, Drs. Araiza and Schipper, P.A. (Defendants).

On Thursday, January 26, 1989, when Plaintiff was nineteen years old, Dr. Schipper performed an outpatient laparoscopy[1] on Plaintiff and confirmed that she suffered from endometriosis.[2] The substance of the malpractice claims was that Dr.

1. A laparoscopy is "a procedure in which a fiberoptic tube is introduced into the abdomen allowing the operator to visualize the pelvic organs and other structures to find abnormalities without the need for general anesthesia or open surgical intervention...." Appellants' Brief at 3.

2. "Endometriosis is an abnormal condition in which endometrial tissue which normally resides in the inner lining of the uterus is found outside the uterus, *e.g.*, bowel, ligaments, ovaries." Appellants' Brief at 2 n. 1.

Schipper negligently injured Plaintiff's bowel while performing the procedure and that, from Thursday, January 27, through Monday morning, January 30, while Dr. Araiza was responsible for follow-up service, he negligently failed to recognize and treat Plaintiff's signs of bowel perforation. Plaintiff developed peritonitis and loss of bowel function that required subsequent surgeries, including a colostomy, a colostomy reversal one year later, and skin grafts.

At trial Plaintiff's expert witness on the standard of care in performing the laparoscopy and concerning follow-up care was Marshall Klavan, M.D., of Pennsylvania. Dr. Klavan is the expert whose financial records were sought by Defendants. While Plaintiff's claim was still pending in H.C.A., Defendants noticed Dr. Klavan's deposition for January 27, 1992, at his office in Pennsylvania. The notice of deposition included the following request:

> "Deponent will bring with him, in addition, all documents, records, notes, correspondence or other documents indicating for the last five (5) years, the amount of hours billed and compensation the Deponent has earned in his review, testimony, court or panel appearances in medical legal cases. Deponent will also produce all records and other documents indicating for the past five (5) years the identity of the cases, the parties and the attorney by whom he was retained in all such medical legal cases."

The notice's certificate of mailing to Plaintiff's counsel is dated January 14, 1992.

From the standpoint of compelling production of the requested documents by Dr. Klavan at the deposition, it appears that Defendants did not utilize the available procedures. Maryland Rule 2–412(c) in relevant part provides:

> "A non-party deponent may be required to produce documents or other tangible things at the taking of the deposition by a subpoena. If a subpoena requiring the production of documents or other tangible things at the taking of the deposition is to be served on a party or nonparty deponent, the designation of the materials to be produced as set forth

in the subpoena shall be attached to or included in the notice and the subpoena shall be served at least 30 days before the date of the deposition."

For a deposition of a non-party to be taken in Pennsylvania, 42 Pa.Cons.Stat.Ann. § 5326(a) (Purdon 1981, 1995 Supp.) meshes with Md.Rule 2–412(c). The Pennsylvania statute provides that "[a] court of record of [Pennsylvania] may order a person who is domiciled or is found within [Pennsylvania] to give his testimony or statement or to produce documents or other things for use in a matter pending in a tribunal outside [Pennsylvania]."

Plaintiff filed a motion in H.C.A. for a protective order against production of financial data by Dr. Klavan. No protective order was obtained, and the deposition proceeded as scheduled.[3] Portions of Dr. Klavan's deposition testimony are in the record extract of this appeal in the form of exhibits to motions of the parties. Dr. Klavan testified that his annual income derived from forensics over the preceding ten years ranged between $60,000 and $70,000, but that in some years it approached $100,000. Forensics work represented from ten to twenty percent of his time. In one year Dr. Klavan was paid $65,000 to $75,000 for forensics by a single Maryland

---

**3.** Where a subpoena for the production of documents by a non-party at that non-party's deposition has been served, and a motion for protective order is filed, Md.Rule 2–510(f) places the burden on the party issuing the subpoena to obtain a court order requiring production of the materials. Rule 2–510(f) reads:

"**Objection to Subpoena for Deposition.**—A person served with a subpoena to attend a deposition may seek a protective order pursuant to Rule 2–403. If the subpoena also commands the production of documents or other tangible things at the deposition, the person served may seek a protective order pursuant to Rule 2–403 or may file, within ten days after service of the subpoena, an objection to production of any or all of the designated materials. The objection shall be in writing and shall state the reasons for the objection. If an objection is filed, the party serving the subpoena is not entitled to production of the materials except pursuant to an order of the court from which the subpoena was issued. At any time before or within 15 days after completion of the deposition and upon notice to the deponent, the party serving the subpoena may move for such an order."

attorney. Defendants also proffer that Dr. Klavan "recognized [as] his" a list that Defendants had obtained from their insurance carrier of 118 cases in which Dr. Klavan had testified.

Dr. Klavan did not produce his tax returns at the deposition. He said that they are filed jointly with his wife and that he would not produce them even if he were ordered by a court to do so. He testified that he did not possess any federal 1099 tax forms, and that he does not maintain a record of his bills for medical legal evaluations and testimony.

Neither after receipt of the motion for protective order and prior to the deposition, nor following completion of the deposition of Dr. Klavan, did Defendants move to compel discovery. Under Md.Rule 2–432(b) "[a] discovering party . . . may move for an order compelling discovery if . . . (7) a nonparty deponent fails to produce tangible evidence without having filed written objection under Rule 2–510(f)." Rule 2–432(b) was not directly applicable inasmuch as Plaintiff had filed a written objection. Nor could Defendants invoke the procedures for compelling discovery, after written objection, as provided by Rule 2–510(f) because Defendants had not subpoenaed the requested documents. The interrelation between Rule 2–432(b)(7) and Rule 2–510(f) is the subpoena. "A subpoena is . . . required to compel a nonparty . . . to . . . produce designated documents or other tangible things at a deposition." Rule 2–510(a).

Trial of this action was scheduled to commence on October 24, 1994. In that month Defendants renewed their quest for material for possible use in impeaching Dr. Klavan. Defendants obtained from the Clerk of the Circuit Court for Frederick County two subpoenas *duces tecum* for Dr. Klavan, returnable at trial. One copy, issued October 11, 1994, was directed to be served on Plaintiff's counsel in Maryland. That counsel refused service, and the process server left a copy of the subpoena, and of its attached schedule of documents to be produced, with the attorney's receptionist. Defendants obtained a second subpoena on October 18, 1994 that was

presented on October 19 by Pennsylvania counsel for Defendants to the Court of Common Pleas of Delaware County, Pennsylvania, the venue of Dr. Klavan's medical office. By an order dated October 20 that was personally served on Dr. Klavan on Friday, October 21, the Pennsylvania court ordered that the Maryland subpoena be served. It appears that the Pennsylvania court was acting pursuant to 42 Pa.Cons.Stat. Ann. § 5324.[4] Defendants have not briefed and argued the efficacy of this service in Pennsylvania.

The schedule attached to, and incorporated by reference into, the Maryland subpoena included the following among the documents to be produced:

"Doctor Klavan will bring with him, in addition, all documents, records, notes, correspondence or other documents indicating for the last five (5) years, the amount of hours billed and compensation he has earned in his review, testimony, deposition, court or panel appearances in medical legal cases and copies of his Federal 1099 tax forms for the past five (5) years. Doctor Klavan will also produce a list of the medical legal cases in which he was retained for the past five (5) years indicating the identity of the cases, the parties and the attorney by whom he was retained. Doctor Klavan will produce a list of all of the laparoscopy cases which he has performed in the past five (5) years."

On Monday morning, October 24, the parties respectively filed in open court motions *in limine,* together with supporting memoranda. Defendants at that time predicated their motion on the validity of the service in Pennsylvania of the Maryland trial subpoena. Plaintiff predicated her motion on "principles similar to a Motion to Quash." Maryland Rule 2–510(e) provides in part that "[o]n motion of a person served with a subpoena to attend a court proceeding ... the court

---

4. 42 Pa.Cons.Stat.Ann. § 5324(a) in part reads:

"A court of record of this Commonwealth may order service upon any person who is domiciled or can be found within this Commonwealth of any document issued in connection with a matter in a tribunal outside this Commonwealth."

may enter an order that justice requires to protect the person from annoyance, embarrassment, oppression, or undue burden or expense. . . ." After hearing argument on behalf of the parties and after considering the parties' memoranda during a recess, the trial court granted Plaintiff's motion and denied Defendants' motion.

Following a jury trial, the verdict was in favor of Dr. Schipper and against Dr. Araiza and the professional corporation (Appellants). Appellants principally argue that the financial data should have been ordered to be produced.

## I

In ruling on the motion *in limine,* the circuit court assumed for purposes of the ruling that service of the Maryland trial subpoena in Pennsylvania was effective, but the court considered it "to be extensively burdensome" to require the witness, on at most three days notice, to produce a list of laparoscopy cases that he did not ordinarily keep and had not made, covering a period of five years. The court also concluded that production of the 1099s was unduly burdensome. The court noted that the problem of Dr. Klavan's refusal to produce financial information had been known for at least two and one-half years, but that, on only three days notice, Defendants had sought to resolve the problem by having the court either order Dr. Klavan to produce the 1099s or prohibit Dr. Klavan from testifying. The latter, the court found, would be "extremely prejudicial and burdensome to the [P]laintiff." On the other hand, for purposes of cross-examination, Defendants had the financial information described by Dr. Klavan in his deposition testimony. With respect to Defendants' request for a list of cases in which Dr. Klavan had testified in the preceding five years, the court pointed out that Defendants had a list of 118 such cases which had been identified on deposition by Dr. Klavan.

Thus, the ground of decision by the circuit court did not address whether, or the extent to which, a court may compel the production of financial information by non-treating,

medical expert witnesses who testify with some regularity for plaintiffs or for defendants. The decision of the circuit court in this case is an appropriate exercise, applicable to the facts of this case, of the judicial discretion recognized in Md.Rule 2–510(e). *See* 2 J. Poe, *Pleading and Practice* § 239, at 178 (1925 Tiffany ed.), where the author cites, at note 14, *Amey v. Long,* 9 East. 473 (1808). There Lord Ellenborough said:

> "[T]hough it will be always prudent and proper for a witness, served with such a *subpoena,* to be prepared to produce the specified papers and instruments at the trial, if it be at all likely that the Judge will deem such production fit to be there insisted upon; yet it is in every instance a question for the consideration of the Judge at *nisi prius,* whether, upon the principles of reason and equity, such production should be required by him. . . . "

*Id.* at 485–86.

At oral argument in this Court, Appellants also asked us "to hold that professional witnesses, who submit themselves to the jurisdiction of Maryland courts, supply written documentation of their forensic activities subject only to *in camera* review for any privacy interest which must be considered." As best we understand the argument, it is not based on any of the subpoenas, other than to the extent that they gave actual notice of Defendants' interest in obtaining the information. The argument begins with the assumption that attorneys who engage experts to testify exercise a degree of control over those experts that enables the attorney to convince the expert to bring to court possible impeaching material. Apparently, under the argument, if the attorney is unable to convince the expert to do so, the attorney would be ethically obliged to engage an expert who would produce potentially impeaching records.

Appellants perceive indications of the control element of their argument in *Myers v. Alessi,* 80 Md.App. 124, 560 A.2d 59, *cert. denied,* 317 Md. 640, 566 A.2d 101 (1989). *Myers* stands for the proposition that a party could not introduce into evidence at a circuit court trial the transcript of the H.C.A.

testimony of an expert whose unavailability in the circuit court had been procured, through non-payment of the expert's fee, by the party offering the transcript. *Id.* at 139, 560 A.2d at 66.

Appellants' invocation of a duty on the attorney who intends to call the expert at trial partakes of the philosophy embodied in Fed.R.Civ.P. 26(a)(2)(B), which is cited by Appellants, but Appellants' argument carries well beyond the philosophy's limits in the federal rule. Fed.R.Civ.P. 26(a)(2)(B) requires a party, without a request to do so, to make disclosure concerning a retained expert, including "a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years." The federal rule does not require disclosure of an expert's financial records without a discovery request, *i.e.*, as a matter of "core disclosure."

A requirement for core disclosure, applicable to all civil cases, was proposed by the Rules Committee to this Court on March 24, 1993 in the form of a new Rule 2–403 in the 124th Report of the Committee. Proposed new Rule 2–403 did not require disclosure of an expert's financial records. *See* 20 Md.Reg. 690, 693 (1993). The proposal, nevertheless, generated such an outpouring of opposition from the legal and other communities in this State that the Committee subsequently proposed limiting core disclosure to motor vehicle tort cases. *See* 21 Md.Reg. 18 (1994). The amended proposal was later withdrawn in favor of using scheduling conference orders to address the discovery needed for evaluating settlement. *See* 21 Md.Reg. 736–37 and Md.Rule 2–504.1.

The type of disclosure urged by Appellants in this case may or may not be an appropriate subject for a possible exercise of this Court's rulemaking power. Automatic financial disclosure by expert witnesses is not, however, an appropriate subject for the judicial pronouncement of a common law rule in light of the history of core disclosure in the rulemaking process in this State, and particularly because any "adjudication" in the instant matter would be dicta.

## II

Appellants also claim that their cross-examination of Plaintiff's mother was erroneously restricted, particularly in the use of pre-laparoscopy hospital records of Plaintiff. Additional facts need to be stated in order to evaluate the contention.

In July 1987, about one and one-half years before the laparoscopy, Plaintiff, a passenger, had injured her head in an automobile accident. Thereafter she suffered a series of what appeared to be post-concussive seizures for which she was admitted to The Gettysburg Hospital from August 4 to August 8, August 11 to August 25, September 8 to September 11, and September 18 to September 23, 1987. For the admission last referred to Plaintiff's diagnosis was changed from "seizure disorder" on admission to a discharge diagnosis of "1. Adjustment disorder, severe. 2. Pseudo-seizures."

A progress record for September 21 in The Gettysburg Hospital records notes that Plaintiff related

"multiple family problems—alcoholic mother who refuses [help ?]. Quick tempered father who strikes her; concern over abuse of siblings; inability to find job that would allow her to leave home; fearing of leaving home—sees herself as protector of sibs."

This information led to a consultation by a clinical psychologist who concluded in relevant part: -

"[Plaintiff's] labile emotions seem to come from the contention in the family of whose roles are to parent the younger children and what freedom there is for the older children to assume their adult life roles."

Defendants obtained Plaintiff's records which total 136 pages from The Gettysburg Hospital. The authenticity of the records was admitted by Plaintiff in pre-trial discovery. Appellants' argument to us is that the information in the hospital record reflecting unfavorably on the parents was relevant to credibility. At trial, there was a considerable conflict between the testimony of Plaintiff's mother and that of Dr. Araiza concerning telephone calls on the weekend following the lapar-

oscopy, including to whom Dr. Araiza spoke, how many telephone conversations were held, and what was said. Plaintiff's father was not called as a witness by either party.

■ In her direct examination Plaintiff's mother had described how restricted Plaintiff had been by the ostomy bag, after which the witness described how active Plaintiff had been before January 26, 1989. On cross-examination Defendants began to frame a question that referred to the September 1987 hospital admission, the Plaintiff objected, and a bench conference was held. Defendants argued that Plaintiff had opened up the subject of prior hospitalizations by talking about Plaintiff's prior health. Defendants said that the pseudo seizures "were attributed to inner-family personal problems, including physical abuse and alcoholism." Defendants presented to the trial court the following arguments for admissibility:

> "First I'm going to attack [Plaintiff's mother] on the statement that she made that [Plaintiff] was hard to keep down. Second, I'm going to point out that at one point [Plaintiff] was abused so badly that [Plaintiff] had to move out of the home. The third thing I'm going to mention is that [Plaintiff's mother], according to [Plaintiff], is an alcoholic. Third I'm going to produce evidence that [Plaintiff's] father is an abuser. All of which should go directly to their credibility."

Plaintiff responded that the information was "absolutely irrelevant[,] ... incredibly prejudicial, and the probative value is next to nothing." The trial court agreed with Plaintiff, and so do we. The purportedly impeaching evidence was not a prior inconsistent statement by the witness. Instead, it was "[o]ther extrinsic evidence," the admissibility of which is governed by Md.Rule 5–616(b)(2), reading:

> "Other extrinsic evidence contradicting a witness's testimony ordinarily may be admitted only on non-collateral matters. In the court's discretion, however, extrinsic evidence may be admitted on collateral matters."

Defendants' proposed line of cross-examination was widely collateral. *See Smith v. State*, 273 Md. 152, 162, 328 A.2d 274, 280 (1974) (discussing collateralness from the standpoint of

relevancy); *Schear v. Motel Management Corp.*, 61 Md.App. 670, 682, 487 A.2d 1240, 1246 (1985); J. Murphy, *Maryland Evidence Handbook* § 1304(A) (2d ed. 1993). The trial court did not abuse its discretion in sustaining the objection.

■ Appellants also submit that they were erroneously prohibited from impeaching the Plaintiff's mother by a prior inconsistent statement on deposition. On direct examination Plaintiff's mother had referred to one enema administered to the Plaintiff on the Sunday following the laparoscopy. Defendants undertook to impeach the witness with a portion of her deposition that the trial court ruled was consistent with the witness's trial testimony. The text of the deposition testimony is not in the record, but we shall assume, *arguendo*, that the claim of error is preserved by Defendants' proffer that the witness testified on deposition that she could not remember the number of enemas. We shall also assume, *arguendo*, that the trial testimony contradicts the deposition testimony. Nevertheless, Appellants have not demonstrated the materiality of the number of enemas and how they were prejudiced by the allegedly erroneous ruling. No ground for reversal has been shown.

*JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.*